Mr. Hilbert. Good morning, Justices. May it please the Court. We're here today on a summary judgment ruling by the Eastern District of Missouri against my clients American Screening, LLC and Ron Kilgarlin and Sean Kilgarlin. The problem we have with the ruling is it's overly broad in its application of its injunction and it's overly broad in its application of monetary relief. The other two issues are regarding Sean Kilgarlin's individual liability and then the Court's denial of our attempt to present some defensive facts that were not directly applicable or responsive to the summary judgment facts submitted by the FTC. So how is it that the injunction is overly broad? Well, the injunction bans our clients for life from selling any PPE and any other products or services that are used to diagnose, prevent, treat, so forth, the definition that's used in the injunction. The cases say that that's a little too much. If you look at the Califano case, it's a Supreme Court case. It basically says when you're entering injunctive relief, it's got to be no more burdensome to the defendant than is necessary to give the plaintiff complete relief. So in this case, what would be complete relief for the plaintiff? The FTC prayed for some measure that would prevent future MITOR violations or mail-order rule violations, those misrepresentations concerning the shipping times and dates. And if you look at the cases cited by the FTC, Colgate-Palmolive-W.T. Grant, Brown v. Plata, Americans United, Soltex v. Fortex, in each of those cases, there was no permanent ban on anybody selling anything. In fact, only one of those cases had to do with selling of a product, and that was the Palmolive case. Counsel, I wanted to ask you, everyone today I think wants to jump to the cases, but I want to jump to the text, which is you have this in the statute, the relevant statute for the injunction, you have a provided further clause. It says provided further that in proper cases the commission may seek, and after proper proof the court may issue a permanent injunction. It authorizes the relief here, but I'm wondering what you make of, usually called provided further, provisos. That's what reading law says about provided clauses. What's your interpretation of that? How does it relate to the rest of the statute, and how does it apply here? To me what it means is you've got to look at the facts and circumstances of each case. What was going on at the time? What type of defendant are you looking at? What were they going through? Did they have prior charges against them by the FTC, prior orders of courts? Are they a years-long recalcitrant type defendant that just refuses to obey orders? I hope that addresses your question. I agree with you, and especially that last part about refuses to follow orders. So I wonder then if you read the statute as a whole, particularly in light of the two conditions at the very beginning of that particular statute, I think. I have it directly in front of me, Your Honor. Yes, but it says violate or about to violate, I think is the exact language. Could the district court have concluded the following? If we lift the preliminary injunction and I don't give a permanent injunction, these people will just go back to violating the law. So they are about to violate the statute if I don't give permanent relief. I think the court addresses the fact—I hope I'm answering your question. I think the court addresses the fact that, hey, it looks like the defendants were doing something. They were changing their messaging. They were issuing refunds before the FTC even came around. But I do think they recognize there's some cognizable danger, I think is the case language used, of some potential for future violation. But the way to address that is not to ban somebody from selling a product. The way to address that is order them not to commit future violations. Order them to follow my tool. Order them to have procedures in place, which the court has also done in this case. But I don't think an outright ban is appropriate, and that's not the reading of the cases. But you do agree that if the district court made that finding, the statute at least allows the district court to do that. Maybe the case law limits it. I'll grant you that. But I just want to nail down the statutory issue. Perhaps the statute is broad enough to where it could do that. But I think that, again, would have to be in the most heinous of situations. One of the facts on which the court seems to have relied in issuing this broad order was that the COVID pandemic was ongoing.  I'm sorry, I don't think I understood. I think it's questionable whether the pandemic is ongoing. In fact, these materials are now quite readily available in most retail stores, including Target and Walmart and the rest of those. Correct. At the time, they, of course, weren't. And it was businesses like my client's business that were out there trying to source the materials, not realizing the tidal wave that was coming that would eventually shut down the ability to buy and sell. I hope I've addressed your concern. I mean, the lawsuit was filed in August of 2020, only a few months after the pandemic began. My client was already trying to address the issues. And certainly in other cases filed by the FTC, they've sought preliminary injunctive release to stop what was going on. That's not what the FTC did here. I suppose because my client was providing a valuable service that people needed. Well, I was just wondering. Working on this difficulty, it's quite obvious that it's no longer ongoing. And so how would that affect the validity of this order, if it would? I mean, my understanding is if a federal court wants to enter an order to stop somebody from doing something, they can certainly do that, and it could go on ad infinitum. But in this case, I don't think it made sense from the beginning and certainly doesn't now. Well, one of the considerations is the nature of the breaches that occurred. And I think the court found that they were egregious. And that's the language the court used. That's correct. But also, I would also point out, and that was later in my argument, but the court also ignored a lot of the facts that we had attempted to insert as defensive, including all of these difficulties and challenges that everyone knows about, but I made them particular to my client. American Screening was faced with ‑‑ The court rejected those in its order. They did. But I was a little concerned about why the court wouldn't allow you somehow to raise those facts. In a summary judgment context. As were we. I mean, the local rule requires you to note the paragraph that you're responding to and your responsive facts, and they have to be, I guess ‑‑ So how do you raise an affirmative defense? Do you have to move a cross motion for summary judgment on it? We're not required to move a cross motion for summary judgment. So how do you raise that? The way the cases say you raise it is you better raise it in your responsive facts or you might lose your opportunity because the plaintiff is not obligated to address the different facts. But the court said there's no such ‑‑ there's not a provision for that in the local rules. I understand that, but even the case the court cites, in that case the defendant didn't address, didn't cite paragraph numbers and they didn't even raise defensive facts. I'm sorry, the defendant didn't in that case identify items in the record. In our case we've identified the record and we've also identified these as defensive facts. So how does this work? So you're saying that at most the court was authorized to enter a partial motion for summary judgment? And that you would have a trial on affirmative defenses? Is that what you're saying? Again, we come to the ‑‑ judge, we come to the court today hat in hand just like we did, our clients did when the original lawsuit was filed. We're complaining about the relief that was granted. We know things were messed up. We what? I'm sorry. We recognized things were difficult and that our client wasn't able to meet all the timing issues and the shipping. But you're not conceding the point with your ‑‑ you raised a point in your briefs about the summary judgment procedure that was used. Correct? I mean, we raised the issue that, you know, you've got to give the benefit of the doubt to the non‑movements in this case. And we've presented evidence as to why it is that an injunction should not have been entered to the point where it bans us from selling product. Wait a minute. You presented evidence or you made statements? We presented evidence. Okay. So are you saying that the court's ruling that you couldn't file this statement? Are you conceding that that was harmless or that you don't care about it or what? No, I don't. So what? So did the court nevertheless listen to these kinds of considerations and make its ultimate determination based on some sort of evidence that was presented with respect to these affirmative defenses? According to the court's ruling, it did not consider, and it considered irrelevant the materials that we presented that were defensive. What material did you present? There were 92 individual statements of fact, supplemental statements of fact, that we presented. But that's just statements. That's not evidence. Well, in addition, there's record citations in the statements of fact. Oh, there are? Correct. Okay. And that's something in the case that the court cited. Okay. But you didn't put on any evidence? No, this was a summary judgment proceeding, paper only. I understand that, but later on you didn't put on any with respect to those affirmative defenses? No, we weren't permitted to. The court interrupted. All right, that's what I meant. So are you suggesting it should have allowed you, or simply should have entered a partial motion for summary judgment and then allowed you to present evidence on your affirmative defenses? I think enter an injunction that prohibits us from misrepresenting our shipping dates and times, but don't enter an injunction that prohibits us from selling a wide array of products. I think that's the distinction. Moving on to the monetary relief issue, we asked the court, look at the plain language of the statute. It calls for that relief which is necessary, and we don't believe that a finding of what is necessary was made in this case. The court used the data summation from the FTC witness and using information provided by our client that shows the total amount of PPE, or personal protective equipment, that was sold during that time period. I'm out of time here, so I'm going to step away and hold the rest of my time. Okay, you may. Mr. Abay. Good morning, Your Honors. Imad Abay from the Federal Trade Commission. Let me start where my colleague started with the permanent injunction. The Supreme Court's standard for a permanent injunction comes from Colgate, and basically says so long as the injunction is reasonably relevant to the unlawful practices, then that's fine. Then the Supreme Court also went ahead and said, but also if you violate the FTC Act, you should expect some fencing in. Fencing in can come in various shapes or forms. It can extend to other products that the same company sells. It can also extend to a permanent ban on participating in a particular activity. There have been a number of Court of Appeals cases that affirm permanent bans to participating in an entire industry. Most recently from the Second Circuit, where it affirmed a ban on participating in the pharmaceutical industry altogether. What about counseled statute? You heard me ask opposing counsel. The provided further is a proviso, and it certainly allows permanent injunctions. I'll give you that. But the beginning of that requires a showing that the person, partnership, or corporation is violating, or is about to violate any provision of law. By the time the permanent injunction was entered, I don't think they were still violating the law. And I didn't see any finding by the district court that they were about to violate if, say, the temporary injunction was lifted or something like that. So I just wonder, quite frankly, whether the conditions in the statute were actually satisfied with the permanent injunction, in the sense that the district court made the appropriate findings. I think the order satisfied the statute language, but I think your Honor's question relates to a preliminary injunction. So Section 13B can be used for two different things. It can be used to move for a preliminary injunction pending an administrative proceeding, which often is used, for example, in merger cases in the FTC. And for that, the FTC will have to show that the conduct that is allegedly violating the law is or is about to, that the defendant is or is about to violate the law. That's for the preliminary injunction. The second proviso that your Honor is referring to, I'm not aware of any case law that says the is or about to must also be satisfied for a permanent injunction. And that sort of makes sense. Okay, tell me why it makes sense, because I don't necessarily agree with you. Oh, absolutely. Because as I think it came up in one of the earlier cases, injunctions look for the future. It is about preventing harm from happening in the future. So in that sense, there are plenty of cases where a violation happens in the past, it stops, and yet an injunction preventing the defendant from doing something in the future is still perfectly proper. And that's what we have here. Okay, so you're arguing that it's what's called an additive proviso, which is how Justice Scalia talks about it in reading law, versus like a conditional proviso, which I understand, and I think there probably is some ambiguity there. But I wonder whether the logic carries through, which is if you were going to ban somebody for the rest of their lives from selling in a particular industry or a particular item, one would think there would need to be some finding that they're likely to do this again, which is kind of like the language here. And I don't know that we have that here. We don't have, well, because it's a pandemic after all, right? What are the chances that these conditions are going to come up again? And I just didn't find that kind of finding in the district court's order. Well, what the district court did find is that the conduct was sufficiently egregious that it would satisfy the WT grant standard for recognizable danger of recurrence. So I guess it's one way to think about it is what your honor is referring to is a sliding scale. If it's a regular conduct that is likely to be repeated, you can get an injunction. If it's a really terrible conduct that we don't know, we're not sure about how quick or how often it might be repeated, the district court is perfectly entitled to weigh that into saying that they are not going to be able to repeat that conduct. If you look at the district court's analysis of the egregiousness of the conduct, I think it informs what your honor's concern is. These defendants, very early on in the pandemic, advertised heavily that they have products, PPE, that people were desperate to find, that they have them in store and ready to ship in as little as 24 hours. They immediately were flooded with orders so that by April, they were already behind on their February orders. And yet, they did not take any steps to correct that. They did not stop the representations of the mailing times. They did not go back to the consumers to seek their consent or give them the offer of a refund. They continued to charge the consumers immediately when they placed the order. The least they could have done is, for example, say, well, okay, we're really falling behind. What we can do is when we ship you the order, we'll charge you. They didn't do that. They were facing 500 complaints a day from consumers. They were really flooded. They didn't do anything. They continued to advertise. They spent over a million dollars in April on advertising available to ship in as little as 24 hours. The pandemic context informed the district court's decision that this egregious conduct is in fact deserving of the permanent injunction. And the district court, by the way, is not alone. There's been a number of courts in the context of the COVID pandemic that have now also issued permanent injunction against PPE sales for conduct similar to defendants here. So that's on the permanent injunction. Well, if we look at the district court's order, how close does he get to, you're right, I think it is the grant standard, some cognizable danger of recurrent violation? I think you brought it up, and I think that is the standard. Correct. How closely does the district court get to that? Well, like I said, I think… I understand your egregiousness argument, and I understand your sliding scale. I'm talking about what the district court really said. Of what it actually… Something like that. You know, something like, what's going to happen? Recurrent violation? Cognizable danger? Something, you know, is there anything in the order? And you could give us a 28-J because it is lengthy. Okay. Well, I'm perfectly happy to, if you don't mind, Your Honor, that I will send you a 28-J, tell you exactly where the district court made those statements. If there are no more questions on the permanent injunction, I'd like to move to the monetary redress. I'd like to ask something about the order. Yes. Which required you to establish a fund and to contact consumers and ask them whether they wanted a refund. Yes, Your Honor. Is that correct? Whether they did not or whether they should have. No, the plan itself. Is that setting this fund up and administrating it and asking for refunds and the rest of that? That's in the MITRE regulation. It's where? In the regulation. The district court found the defendants in violation of two separate things. One of them is Section 5 of the FTC Act for making misrepresentations about the shipping time. And the second is three separate violations of a regulation that the FTC enforces referred to as MITRE or the merchandise rule. One of the three violations, the rule requires the seller first to have a reasonable basis. When I say I'm going to ship something in 24 hours, I have a reasonable basis for that. The district court said they did not have a reasonable basis. The second provision of the regulation says if you don't have a reasonable basis or if you find out that you're going to be late, you have to go back to the consumers and say, oh, we promised you 24 to 48 hours. We can't meet that. Can you consent to a later shipping or would you like your money back? They also did not do that. Then there's a third requirement in the regulation that if you do not do either of the first two, then the seller themselves, without request from the consumer, have to cancel the order and refund the money to the consumer. They did not do that either. And that's really the basis for the monetary interest. I understand that, but you were ordered to establish a plan for administering the fund. Oh, I'm sorry, you're talking about the claims process at the end? Yes. Oh, I apologize. The plan. I misunderstood. Yes. That's the word that's used, I think, in the order. Sorry. Yes, I apologize. Is the plan in there?  All right, that's fine. I just wondered what form your notification of a possibility of refund was going to take. That could be important, but never mind. I know that it's not been formulated. Right, it has not been formulated. Awaiting disappeal. Yes, thank you. Counsel, I wanted to get on the monetary relief. I just wanted to add to the chase because you're running out of time. Yes. And as the court finds necessary to redress injury to consumers or other persons. Here's the problem. I don't think the district court ever made that finding. And I think it's pretty clear that the district court did not. And I'm going to give you an example. And suppose you're selling Lamborghinis. And the Lamborghinis, they say, we're going to deliver it in two weeks. And they don't deliver it in two weeks. And they don't offer a refund. The Lamborghini comes in six weeks. Does the consumer then get a free Lamborghini? And that's essentially what's happening here. You've got to send all this personal protective equipment. And all the consumers who ordered it are now getting it free. Even though the pandemic went on for three or four years. And presumably the consumer's got some value from the PPE they were sent. Let me ask. There are two responses to that. One, in terms of the law. The way it works is in cases like this where we have thousands of consumers, the law requires the agency to establish a starting point, a baseline, for what the injury is or the quantification of the injury is. And multiple cases, multiple court of appeals, although not this one, said that the net revenue is a good basis to start because that's what the records that are available would allow you to do. Then the burden shifts to the defendants to show, oh, no, this does not, you know, there is this group of consumers that, in fact, got them on time. There is this group of consumers that were satisfied and said they were satisfied. There is this group of consumers that should not get a refund for one reason or another. Defendants here did none of that. The agency established the baseline of what the refund is, which is people who ordered on the assumption they were getting their orders in 24 to 48 hours, and they didn't. Why is it their burden versus the FTC's burden to say here's a reasonable estimate? You just heard us in a previous argument talking about the fact that the person who's trying to get or the agency that's trying to get damages needs to prove, you know, a reasonable approximation. No, absolutely, Your Honor. But like I said, the way the consumer law developed in cases where it involved thousands of consumers, it is impractical for the agency to go to every consumer to get their declaration. And so it established what the presumption of reliance and this mechanism of as long as the FTC can establish a reasonable approximation as a baseline, and in here, if I may just finish saying that. As long as Judge Strauss inquires, proceed. Absolutely. The FTC here relied on defendants' own records to establish what the baseline is. Then the case law, again, there's no decisions from this court, I think, but the sister courts, the unbound court in the 10th Circuit, the 9th Circuit, the 4th Circuit, the 11th Circuit, all have set up this burden-shifting framework for addressing cases that involve thousands of injuries. Well, let me just ask you this one last follow-up. Yeah. Could the district court have said, for example, that I think 20 percent, there should be a 20 percent reduction in this $14 million award because some people got the PPE, some people used the PPE, et cetera, et cetera. In other words, if that could happen, then I have a problem with this order because the district court didn't really make the finding that it was necessary to, and I quote, redress injury. The district court did find injury, certainly found injury as part of the liability, but to your question, the district court, if it had some basis to say it's reasonable to reduce it by 20 percent, that may be true. If the other side had produced evidence, for example, to say, okay, the PPE that we shipped, because it was late by four weeks, it's now worth 80 percent. That would be reasonable. Bear in mind also that defendants here was not only an issue of delay. There were thousands of cases where if consumers complained enough and sort of raised hell enough, they would ship them something, something called SKU swapping, which is not the order that the consumer in fact wanted. So I think the district court did exactly what the law required it to do, which is it asked the FTC to set up the baseline. It asked the other side if they had anything in response, and they didn't. Okay, I got it. Thank you. Thank you for the argument. Mr. Hilbert. You know, just straight to the baseline value issue, I mean, the PPE had the same value the day it was shipped. It had the same value the next month, the next year. I mean, the Federal Defense Department was requiring everyone to wear a mask up through a year and a half ago. The price is the best indicator. The purchase price paid is the best indicator of what the value was. There was no diminution. But the problem is is they came so late. And that's why I think this all or nothing is not great, but there's something there there, which is some of it people like this happened to me where we would order something, and it would turn out to be late, and I would go buy it from somewhere else. And so by the time the PPE came, you know, it's sitting in my basement still because I never used any of the masks or the gloves or anything else, and that's the problem. And I think we even suggested in our brief, why don't you send a notice out to consumers and see who actually, maybe you can determine who didn't use it or didn't need it, and then we can handle it from there. Some courts have, when they set up this plan or this fund, they say, why don't you make a down payment to pay the FDC's administrative costs. Let's determine what that number is. In the QIK Brands case, the FDC argued to the court that in these situations, particularly with this amount of time that's gone by, they don't typically get more than 5% to 20% response from consumers. American Screening has already refunded $3 million, which is 20% almost exactly of the orders that were placed. So it would surprise me if we got any response. And with that, I'll leave the court unless there's questions. Okay. Seeing none, case number 23-1616 is submitted for decision of the court. Ms. Henderson, does that conclude today's docket? Yes, Your Honor.